CUSUMANO, APPELLEE, *v.* PEPSI-COLA BOTTLING CO.; ET AL., APPELLANT.

[Cite as Cusumano v. Pepsi-Cola Bottling Co., 9 Ohio App. 2d 105.]

106

(No. 27772—Decided January 26, 1967.)

*Mr. Michael Shane,* for appellee.
*Messrs. McNeal & Schick* and *Mr. Robert G. Quandt,* for appellant, Beverages, Inc.

SILBERT, J. This is an appeal on questions of law from a verdict and judgment for the plaintiff, appellee herein and hereinafter referred to as plaintiff, in the Court of Common Pleas of Cuyahoga County.

The instant case arose as the result of an accident which occurred on February 11, 1959, when the bottom of a Pepsi Cola case collapsed while plaintiff was attempting to remove it from the top of a stack of Pepsi Cola cases located in the stockroom of his grocery store. Plaintiff, Ignatius Cusumano, brought suit, claiming to have sustained serious injuries—principally consisting of the aggravation of a pre-existing degenerative disc condition—as a result of this accident. After trial the jury returned a verdict in the amount of $17,500 against the defendant distributor, Beverages, Inc.

The errors assigned by the defendant-appellant, hereinafter referred to as defendant, are as follows:

1. The trial court erred in charging the jury on *res ipsa loquitur.*

2. The trial court erred in overruling defendant's motion for a directed verdict.

3. The trial court erred in failing to strike Dr. Columbi's opinion.

4. The trial court erred in refusing to strike Dr. Alfred's opinion, for failure to prove aggravation of a pre-existing degenerative disc condition and for failure of proof in causally relating the incident and injury to which he testified to the incident of which plaintiff complains.

5. The trial court erred in its general charge on future pain and suffering.

6. The trial court erred in charging the jury as to the items of damage it might consider.

7. The trial court erred in failing to stop the improper argument of counsel for plaintiff-appellee and in failing to instruct the jury to disregard such improper argument.

8. The trial court erred in overruling defendant's motion for a continuance.

9. The trial court erred in giving and in refusing to give specified special instructions.

10. The trial court erred in admitting plaintiff's Exhibit 1 into evidence without qualification.

11. The trial court erred in overruling defendant's motion for judgment notwithstanding the verdict.

12. The trial court erred in overruling defendant's motion for a new trial.

In its first assignment of error defendant argues that the doctrine of *res ipsa loquitur* is inapplicable—even if the facts are as plaintiff contends—as in the instant case there could be no control by the defendant of the injury-producing instrumentality. Alternatively, defendant contends that the plaintiff has failed to prove the facts necessary for the application of the doctrine of *res ipsa loquitur.*

Initially, it must be noted that this court (Artl, Skeel, Corrigan, JJ.), in a *per curiam* opinion, *Cusumano* v. *Beverages, Inc.* (1964), 95 Ohio Law Abs. 131 appeal dismissed in (1964) 177 Ohio St. 100, held that "the doctrine of res ipsa loquitur is clearly applicable" to the fact situation of this case. This decision, of course, is binding on the court in the instant case. However, as several very difficult questions under the doctrine of *res ipsa loquitur* as applied in Ohio are raised herein, we will briefly review the development and applicability of this doctrine.

Apparently the term *"res ipsa loquitur"* first originated in the case of *Byrne* v. *Boadle* (Exch., 1863), 2 H. & C. 722, 159 Eng. Rep. R. 299. Its use spread rapidly in the United States during the early 1900's and first appeared in the Ohio Supreme Court reports in the case of *Cincinnati Traction Co.* v. *Holzenkamp* (1906), 74 Ohio St. 379, 384. As most commonly stated, the doctrine (1) permits the jury to draw an inference of negligence, (2) where the instrumentality causing the injury is under

the exclusive management and control of the defendant, and (3) the accident occurs under such circumstances that in the ordinary course of events it would not occur if ordinary care was observed. 39 Ohio Jurisprudence 2d 739, Negligence, Section 151. Element (2) appears to be deceptively simple, when in fact it has been subject to much and varying interpretation. See, Annotation 169 A. L. R. 953, 961 (1947).

In effect, there are presently two approaches utilized by the courts. The first one, a strict interpretation, sometimes equates "control" with actual physical possession of the injury-causing instrumentality at the time the accident occurs. The other approach requires something less than actual physical possession, and those courts utilizing this method usually formulate the rule in terms of "control at the time that the negligent act was committed," "control of the causative force," or some other such implicit or explicit combination of words which allow a plaintiff in physical possession of the injury-producing instrumentality to rely upon the doctrine of res ipsa loquitur when he can prove that there has been no mishandling or damage to the instrumentality since the time it left the defendant's possession. The rule in Ohio appears to be as follows: Actual management and control of the injury-producing instrumentality by the defendant is usually required, but if the instrumentality has been out of the defendant's possession for no more than a reasonable period of time and the plaintiff can show that the instrumentality has not been mishandled or tampered with and there is no probability that any other intervening force has had an effect on the instrumentality, then the doctrine of res ipsa loquitur will be applicable.

To understand the derivation of this rule, it is necessary first to review a synthesis of prior Ohio cases.

In the early cases the Ohio courts tended to follow a literal interpretation of the requirement of control, and, although, to our knowledge, no Ohio court has specifically stated that actual physical possession by the defendant of the instrumentality was necessary, statements that "sole and exclusive control" by the defendant was required were common. Sherlock v. Strouss-Hirshberg Co. (1936), 132 Ohio St. 35 (no control by the defendant of a stool in its department store aisle); Farina v. First National Bank (1943), 72 Ohio App. 109, 111 (no control by the de-

fendant of its revolving door which collapsed on the plaintiff); and *Fink* v. *New York Central Rd. Co.* (1944), 144 Ohio St. 1. Furthermore, in cases where there was a possibility of another force intervening, the courts were strict in their findings that "control" had not been established. See *City of Cleveland* v. *Pine* (1931), 123 Ohio St. 578; and *City of Cleveland* v. *Amato* (1931), 123 Ohio St. 575.

Although there were a few divergent voices, see *Class* v. *Young Women's Christian Assn.* (1934), 47 Ohio App. 128, the first cracks in the armor of literal interpretation of "control" began to appear with the proliferation of "exploding bottle" cases. In *Fick* v. *Pilsener Brewing Co.* (Cuyahoga County Common Pleas Court, 1948), 54 Ohio Law Abs. 97, affirmed without opinion by the Court of Appeals, No. 21123, in 1949, and appeal dismissed by Supreme Court, No. 31817, in 1949 (wherein plaintiff lost an eye when a beer bottle exploded), the trial judge (McNamee, J.) stated, at page 100 of 54 Ohio Law Abs.:

"Since its incorporation into the law of evidence the doctrine [of *res ipsa loquitur*] has been applied in an ever increasing variety of factual situations. For the most part, the courts of England and this country have confined its application to those cases where the instrumentality causing the injury was within the exclusive control and management of the defendant at the time the accident occurred.

"The invention of the doctrine was the response of reason to the necessities of justice. Rational inference was accepted as an adequate probative substitute for affirmative proof of negligence. The doctrine of res ipsa loquitur has stood the test of time and is recognized generally as a safe postulate of judicial inquiry. The reasons which support the doctrine in its original concept are no more compelling than those considerations which argue for its extension and application to cases where a manufacturer, assembler or distributor delivers to others ordinarily safe instrumentalities in a condition that renders them dangerous and unsafe when handled carefully in the customary and expected manner."

The court then went on to overrule defendant's motion for a new trial and, thereby, hold that the doctrine of *res ipsa loquitur* was available to the injured plaintiff.

Acceptance of a relaxed interpretation of "control" in

*res ipsa loquitur* cases, however, was slow in coming, see *Feinberg* v. *Hotel Olmsted Co.* (1949), 152 Ohio St. 417 (no control by the defendant of its freight elevator when it fell), and the tendency was to confine this relaxation to "exploding bottle" cases. See, Annotation, 4 A. L. R. 2d 466 (1949); Note, 20 Ohio St. Law Journal 714 (1959). However, a major change in Ohio law came in the case of *Koktavy* v. *United Fireworks Mfg. Co.* (1954), 160 Ohio St. 461. In that case (involving a premature explosion, which severly injured the plaintiff, of an aerial salute bomb which had been out of defendant's possession for at least two months), paragraph one of the syllabus states:

"*Ordinarily* the rule of *res ipsa loquitur* is not applicable against a party because of an instrumentality causing injury and damage to another unless such party had exclusive possession, control and management of the instrumentality at the time it caused the injury." (Emphasis added in part.)

This was in contrast to the usual Ohio statement that exclusive control and management by the defendant was required.

Although in *Koktavy* the Supreme Court upheld the direction of a verdict for the defendant, it stated at page 471:

"We conclude, therefore, that ordinarily there must be custody, control and management of an injury-causing instrumentality by a party in order to render applicable against him the rule of *res ipsa loquitur,* and that before the rule may be applicable against a party out of such custody, control and management, there must be a complete showing that the instrumentality could not have been mishandled or tampered with between the time of its leaving the custody of the one sought to be charged and the time of the accident causing the injury."

See, also, *Krupar* v. *Procter & Gamble Co.* (1954), 160 Ohio St. 489.

The next landmark Ohio case was *Schafer* v. *Wells* (1961), 171 Ohio St. 506, noted in 30 Cincinnati Law Rev. 543 (1961). In that case, by a four-to-three decision, the court held, in paragraph two of the syllabus:

"Where a defendant undertook to service and repair an oil furnace of plaintiff by the installation of a different burner in place of the old one and, before the work was fully completed and permanent supports installed, lighted and tested the fur-

nace and left the premises of the plaintiff with the furnace in operation, and about one and one-half hours later fire was discovered in the room where the furnace was located, no one having entered the furnace room since the defendant's departure, it was not error for the trial court, as the trier of the facts, to find that the defendant had exclusive control and management of such furnace, for the purpose of considering the applicability of the rule of *res ipsa loquitur.*"

The majority of the court in that case rejected the strict application of the "control" element of *res ipsa loquitur* by holding it was error for the Court of Appeals to deny that there was "control" in the defendant under the facts presented. See 171 Ohio St. at 511-12; Herbert, J., dissenting in *Price* v. *Dot's Super Market, Inc.* (1964), 177 Ohio St. 122, 127. Furthermore, the basis of the reasoning of the dissenting judges was that the *factual* situation of that case did not justify the application of *res ipsa loquitur,* as the evidence displayed that the fire "could have been due as well to the intervention of an outside force." 171 Ohio St. at 517. Also, a reading of the dissent indicates that there was no disagreement regarding the application of the doctrine of *res ipsa loquitur* where there has been "a complete showing that the instrumentality could not have been mishandled or tampered with between the time of its leaving the custody of the one sought to be charged and the time of the accident causing the injury." See Judge O'Neill's majority opinion in *Huggins* v. *John Morrell & Co.* (1964), 176 Ohio St. 171, 179-180.

Finally, in *Huggins* v. *John Morrell & Co.* (1964), 176 Ohio St. 171 (involving a demurrer to a cause of action in *res ipsa loquitur* for injuries sustained by plaintiff when a glass jar of pigs feet exploded), the Ohio Supreme Court, in reversing the Court of Appeals, stated at page 179:

"Where the allegations of a petition show that the defendant did not have custody, possession, control or management of the instrumentality at the time of the injury, or for an indeterminate period of time prior to the injury, the doctrine of *res ipsa loquitur* is not available to the plaintiff against the defendant, unless the plaintiff *alleges and shows* that the the [*sic*] instrumentality was not mishandled or altered subsequent to

the time it left the defendant's custody, possession, control and management.'' (Emphasis added in part.)

Consequently, from a thorough analysis of the above-cited cases, we may conclude that the trend of Ohio decisions is toward the rule that actual management and control of the injury-producing instrumentality by the defendant is usually required, *Koktavy* v. *United Fireworks Mfg. Co.* (1954), 160 Ohio St. 461, but if the instrumentality has been out of the defendant's possession for no more than a reasonable period of time, under the facts and circumstances of the case, see *Schafer* v. *Wells* (1961), 171 Ohio St. 506, and the plaintiff can show that the instrumentality has not been mishandled or tampered with, *Huggins* v. *John Morrell & Co.* (1964), 176 Ohio St. 171, and there is no probability that any other intervening force has had an effect on the instrumentality, *Renneckar* v. *Canton Terminal Restaurant, Inc.* (1947), 148 Ohio St. 119, then the doctrine of *res ipsa loquitur* will be applicable.

Furthermore, many prominent commentators on the doctrine of *res ipsa loquitur* advocate a flexible interpretation of the element of ''control'' and counsel against a rigorous enforcement of a literal interpretation. See, Prosser on Torts (3 ed., 1964) 224, Section 39, Chapter 6; 2 Harper & James, The Law of Torts (1956) 1085, Section 19.7, Chapter XIX; Restatement of The Law of Torts 2d (1965) 61, Section 328D.

With this background in mind, we may proceed to an analysis of the facts of the instant case. A thorough review of the bill of exceptions demonstrates that the plaintiff introduced uncontradicted evidence of the following:

On February 9, 1959, defendant's driver salesman delivered to the plaintiff's store seven cases of Pepsi Cola, four of which cases were taken into the stockroom by the driver salesman and stacked upon three cases of Pepsi Cola already there, thus making a stack seven high. This procedure by the driver salesman was witnessed and testified to by plaintiff's brother, Frank Cusumano. On February 11, 1959, the plaintiff went into the stockroom and attempted to lift the top case off this stack of seven and, while so doing, the bottom fell out of the case, whereupon the plaintiff fell backward and was injured. Furthermore, the evidence discloses that the only persons who could possibly

have come in contact with this stack of Pepsi cases between February 9, 1959, and February 11, 1959, were the plaintiff, his partners, their wives and the Coca Cola driver. However, the evidence discloses that none of them touched or in any way disturbed the stack of Pepsi cases during this period.

Consequently, from this analysis of the evidence, it is apparent that the requirements of the Ohio rule, hereinbefore stated, have been met; and, although the instant fact situation is a slight, but logical, extension of the prior reported Ohio cases, it is apparent that the application of the doctrine of *res ipsa loquitur* hereto is in accord with the prior reasoning and holdings of the Ohio courts. Therefore, defendant's assignment of error No. 1 is overruled.

In assignment of error No. 3, defendant argues that the trial court erred in failing to strike the testimony of plaintiff's medical witness, Dr. Columbi. In support of this contention, defendant relies upon the rules that, although an expert may testify to his opinion based upon his personal knowledge and observations, he may not base his opinion upon hearsay statements of others, 2 Jones on Evidence (5th ed., 1958) 794, Section 421, and that an expert cannot base his opinion upon the opinions of other experts, 21 Ohio Jurisprudence 2d 436, Evidence, Section 426. These rules, of course, are correct statements of the law. However, a review of the evidence and cases quickly displays their inapplicability to the instant situation.

Defendant specifically points to Dr. Columbi's statement on recross-examination wherein he testified:

"Q. I am not trying to deviate you from your testimony. As I understand it, the testimony you have given today—I am not questioning the diagnosis—but the testimony you have given today in open court is based to some extent on information you learned from Dr. Karl Alfred? A. Yes.

"Q. It was likewise necessary for you to rely on that testimony, or you could not have testified today? A. Yes."

However, a fair reading of the record discloses that Dr. Columbi is only referring to how he knew whether the plaintiff went to Dr. Alfred and to what happened after the plaintiff left his care. This is shown by the record of cross-examination:

"Q. Doctor, since you last saw Mr. Cusumano in 1959, I

take it you had no way of knowing, without talking to anybody, how long the condition continued beyond May 11, 1959? A. Yes, because I talked to Dr. Alfred, who treated it.

"Q. But aside from what Dr. Alfred gave you, blocking that out for the purpose of our discussion, without talking to Dr. Alfred, you would have no way of knowing how long the muscle spasm continued after May 11, 1959? A. No, only from talking to Dr. Alfred and Mr. Cusumano.

"Q. Other than talking to Dr. Alfred and Mr. Cusumano, you would not know? A. No.

"Q. Likewise, you would have no independent knowledge of how long the strain continued beyond May 11, 1959? A. Except talking to Dr. Alfred."

It is obvious that in the originally quoted statement defense counsel had Dr. Columbi slightly confused. However, on redirect examination Dr. Columbi unequivocally stated:

"Q. You have been questioned about the letter with the diagnosis with severe sacroiliac strain, bilateral, and spasm of the lumbosacral muscles. Was this your own independent diagnosis? A. Absolutely.

"Q. This was not at all, or in any way, was not based on any other physician's diagnosis? A. Absolutely."

Furthermore, on recross-examination, when defense counsel again went into this subject, the following appears:

"Q. Getting back to what Mr. Shane asked you—it is important—was my statement that the testimony you gave today in open court, including your opinion, diagnosis, and findings—was this based to some degree on what you got from Dr. Alfred? A. No. The answer I gave him was that my diagnosis and my opinion were from my own questioning and my own examination.

"Q. Were you confused by the question I am asking you? A. Mr. Shane asked me about the diagnosis I reported. What else?

"Q. I am confused myself.

"Mr. Shane: Let him testify.

"Q. The diagnosis you testified to was from what? A. I made a diagnosis. I concurred. I gave my own examination and treatment. This report was written April 2nd. I still say this

diagnosis was strictly from my own observation of the patient."

Consequently, it is apparent that the instant situation is not the normal objectionable opinion on an opinion or an opinion based upon hearsay. At most there is some confusion, and possibly there may even have been some hearsay regarding subsequent treatment of the plaintiff; but our reading of the bill of execeptions discloses that it has not infected Dr. Columbi's diagnosis and is not objectionable.

Defendant cites *Holt* v. *Hartschuk* (1953), 96 Ohio App. 491; *Zelenka* v. *Industrial Commission* (1956), 165 Ohio St. 587; *Bluebird Baking Co.* v. *McCarthy* (Franklin County Court of Appeals, 1935), 19 Ohio Law Abs. 466; and *Fox* v. *Industrial Commission* (Muskingum County Common Pleas Court, 1953), 65 Ohio Law Abs. 343, in support of its contentions. However, a cursory review of these cases displays their inapplicability to the instant situation.

Defendant also contends, citing *Scaglioni* v. *Oriti* (1948), 83 Ohio App. 351, that Dr. Columbi's testimony was based upon his opinion at the time of his original examination and not upon his opinion at the time of the trial. In that case, the specific questions involved were phrased as what did the doctor believe the cause to be at the time he first examined the plaintiff. However, in our case, the specific question, on direct examination, was as follows:

"Q. Doctor, do you have an opinion based upon reasonable medical certainty from your study and examination of this man whether the condition of his low back you have told us about resulted from the accident of February 11, 1959? A. Yes, I do."

It is apparent that there is no time reference incorporated herein, and it must be assumed that it is Dr. Columbi's opinion as of the time of the trial. Hence, *Scaglioni* v. *Oriti* (1948), 83 Ohio App. 351, is inapplicable.

In its fourth assignment of error, defendant contends that plaintiff's evidence does not prove the aggravation of a preexisting degenerative disc condition and, alternatively, that plaintiff's evidence failed to establish that such injury was the proximate result of the claimed negligence of the defendant. Therefore, it contends that Dr. Alfred's testimony should have been stricken. To accomplish this it relies upon the following

confusing statement brought out on cross-examination to show that the accident had no causal relationship to the incident on February 11, 1959:

"Q. Can you tell whether the aggravation which you diagnosed, which was not shown to be progressive between May 1959 and January 1962, was caused by the incident of February 1959? A. No. As I explained before, this man had a recurrent backache."

But, if we review the total direct examination and cross-examination of Dr. Alfred, bearing in mind the fact that Dr. Alfred is the plaintiff's own physician and not an expert called solely for testimony at trial, and also bearing in mind the exception to the hearsay rule that a "physician may testify as to his opinion based on subjective symptoms and history narrated to him in the course of an examination made for the purpose of treatment and cure," 2 Jones on Evidence 796, Section 421, Chapter X, then the excerpts from the record, which follow, give a more accurate picture of Dr. Alfred's testimony.

Dr. Alfred's testimony discloses that he first examined plaintiff on May 18, 1959, and at that time X-rays disclosed a degenerative fourth lumbar disc. He testified that when plaintiff first came to see him "he was found to have a marked muscle spasm in the back, straightening, and poor motion in any direction, all motion with pain [and] tenderness in the midline, lower back region. * * *." On further direct examination, Dr. Alfred testified:

"Q. Doctor, do you have an opinion based upon reasonable medical certainty, an independent opinion, from your study of this man's condition and history, whether or not the condition in the low back, the first time you saw him and when you continued to see him, resulted from the occurrence of February 11, 1959?

"* * *

"The Witness: I do.

"The court: Is there a causal relationship between his condition and what occurred to him as related to the history that you have? Can you answer the question?

"The Witness: Yes, I have.

"Q. Would you tell us that opinion? A. There is a causal relationship. If I can explain this in more than a few words, Judge—

"Q. What do you base that on? A. I base it on the history and the examination and my own experience

"* * *

"Q. On what basis, Doctor? A. Based on the aggravation and disc degeneration."

Later, in the direct examination, the following appears:

"Q. Doctor can you tell us with a reasonable degree of medical certainty, from your history and examination and treatment of this man, whether your own findings and the other findings had a causal relationship to the event which occurred on February 11, 1959, within the realm of medical probability? A. In this type of thing, the injury which the man sustained in February, 1959, initiated the disability—

"The Court: Would you repeat that?

"The Witness: The injury initiated the disability."

Furthermore, on cross-examination, Dr. Alfred testified:

"Q. I did not mean to put words in your mouth, but I think you said in your own words that the symptoms given to you by Mr. Cusumano were causally related to the history given to you by him; is that right? Is that more accurate? A. Yes.

"Q. When you have based your answers on causal relationship or diagnosis, all these answers related back to the history given by you this morning? A. Yes."

On redirect examination, Dr. Alfred testified:

"Q. The question was put to you by Mr. Quandt about an aggravated pre-existing degenerative disc condition. That is the term he used? A. Yes.

"Q. Will you describe what the aggravation was? A. The aggravation was that this man had sustained a back injury from which he probably would have recovered and done well if he did not have this pre-existing back condition which has become symptomatic and remained symptomatic.

"* * *

"Q. You said the disability commenced with this occurrence, as opposed to his prior problem? A. Yes."

And, on recross-examination, the following appears:

"Q. Just one or two questions. The disability began with the incident of February, 1959? A. Yes."

Defendant cites a series of Workmen's Compensation death cases in support of its allegation of lack of proof of causal relationship of the incident on February 11, 1959, to the aggravation of the degenerative disc condition, i. e., *McKee* v. *Electric Auto-Lite Co.* (1958), 168 Ohio St. 77; *Senvisky* v. *Truscon Steel Division of Republic Steel Corp.* (1959), 168 Ohio St. 523; and *Gerich* v. *Republic Steel Corp.* (1950), 153 Ohio St. 463. However, an examination of these cases reveals that they were cases of insufficient proof of acceleration of death by reason of the work-related activities of the decedent. See *Pierson* v. *Hermann* (1965), 3 Ohio App. 2d 398, 402.

Consequently, from a review of the testimony, it appears that Dr. Alfred specifically testified regarding the question of aggravation and causal relationship. Although defendant's confusing question on cross-examination appears to conflict somewhat with the witness's other testimony, this conflict is only a question going to the weight of the evidence to be determined by the jury. The trial court correctly so ruled.

In its sixth assignment of error, defendant alleges that the trial court erred in failing to charge the jury in its general charge that the amount paid for assistance in his store by the plaintiff must be shown to be reasonable by the preponderance of the evidence. Defendant cites 16 Ohio Jurisprudence 2d 241, Damages, Section 106, as stating the general rule. This section, however, reads:

"Generally in tort actions the injured party may recover for reasonable expenses necessarily incurred by him as a proximate result of the defendant's wrongful act, and for the reasonable expenditures made by him in an attempt to avoid or lessen his damages. He may recover moneys expended in hiring competent help to do work which the injured party, but for his injury, could and would have done himself, since one who suffers personal injury from the wrong of another should be satisfied for all the damages he has suffered in the loss of his business, his health, his time, and for the amount of his expenses. * * *"

In the instant case, plaintiff testified as to the amounts of

money he paid for help at his store since the time of the accident. This testimony was broken down into the amounts paid to each of three employees over a four-year period. In turn, each of these employees testified as to the amount received from the plaintiff during the period of his employment—all of which testimony was in agreement.

While it appears to be the rule in Ohio that testimony must be offered to show that *medical expenses* incurred were "reasonable," *DeTunno* v. *Shull* (1957), 166 Ohio St. 365; 16 Ohio Jurisprudence 2d 242, Damages, Section 107, it does not appear from the reported cases that the same rule of required testimony has been applied in areas where expenses are "common, ordinary matters within the realm of knowledge of the average layman," *Bagyi* v. *Miller* (1965), 3 Ohio App. 2d 371, 377; Annotation 37 A. L. R. 2d 364, 368 (1954). Consequently, there should be no error prejudicial to the defendant in the trial court's submission of these items of damage to the jury.

Defendant contends in assignment of error No. 2 that the trial court erred in overruling its motion for a directed verdict; in assignment of error No. 8 that the trial court erred in overruling its motion for a continuance; in assignment of error No. 9 that the trial court erred in giving and in refusing to give specified special instructions; in assignment of error No. 10 that the trial court erred in admitting plaintiff's exhibit No. 1 into evidence; and in assignment of error numbers 11 and 12 that the trial court erred in overruling its motions for judgment notwithstanding the verdict and for a new trial. However, after a thorough review of these assignments, we find that they have no merit whatsoever, and, therefore, they are overruled.

At the close of all the evidence and upon defendant's motion, the trial court removed the plaintiff's claim for permanency of injuries from the jury's consideration by reason of plaintiff's failure of proof. In its general charge the trial court instructed the jury to disregard the claim of permanency; however, it did instruct the jury that it might consider "any pain and suffering as you find it to be reasonably certain * * * [the plaintiff] will suffer in the future." In assignment of error No. 5, defendant contends that this instruction constitutes prejudicial error.

While the record discloses that there is extensive testi-

mony regarding plaintiff's injuries up to the time of the trial, it fails to disclose any expert testimony regarding the expected future duration of such pain and suffering. The general rule appears to be that "if the injury is of an objective nature (such as the loss of an arm, leg, or other member) the jury may draw their conclusions as to future pain and suffering from that fact alone (the permanency of such injury being obvious); whereas there must be expert evidence as to future pain and suffering or permanency where the injury is subjective in character." *Day* v. *Gulley* (1963), 175 Ohio St. 83, 86; Annotation 115 A. L. R. 1149, 1150 (1938); 22 American Jurisprudence 2d 399, Damages, Section 299.

In *McCoy* v. *Gilbert* (1959), 110 Ohio App. 453, a case wherein the injuries suffered by the plaintiff were more extensive than in the instant case, see 110 Ohio App. at 460, the Court of Appeals held that, in the absence of expert testimony as to how long in the future the plaintiff's pain and suffering would continue, a charge to the jury that it might find that the plaintiff suffered permanent injuries is prejudicial error. Although this case involved permanent injury (instead of future pain and suffering), it indicates the Ohio division between objective and subjective injuries. Consequently, it would follow that the injuries involved in the instant case would be classified as subjective.

In *Brush* v. *Eastern Motor Dispatch, Inc.* (Franklin County Court of Appeals, 1950), 61 Ohio Law Abs. 219 (involving an automobile-truck collision in which plaintiff suffered injuries), the trial court ruled that permanency was not pleaded (except as regards a scar on the knee) and hence no testimony could be offered thereon, yet in its general charge it told the jury that it could consider any pain and suffering that "it is reasonably certain that the plaintiff will suffer in the future." The Court of Appeals held this charge to be prejudicial error, and, in paragraph two of the syllabus, stated:

"Where no evidence has been presented as to the possible duration of pain and suffering occurring as a result of an injury, an instruction to the jury that they could consider future pain and suffering in assessing damages, is erroneous and prejudicial to the defendant."

Consequently, on the basis of the above cases, we determine,

and therefore hold, that, as the trial court's charge permitted the jury to speculate regarding plaintiff's damages, as they had no means by which to determine for what length of time any pain and suffering would continue, prejudicial error was thereby committed.

In assignment of error No. 7, defendant alleges that the trial court erred in failing to stop the improper argument of plaintiff's counsel. In this regard it specifically refers to the colloquy which plaintiff's counsel developed by placing exhibit No. 1 (the Pepsi Cola case) on the witness stand. That colloquy is as follows:

"Mr. Shane: * * * Please testify, Mr. Box—Mr. Pepsi-Cola Box. What is this box going to say? I don't know how old I am. I was born somewhere between 1936 and 1954. I was put together by Traub Box Company. I had metal bands and nails.

"Mr. Quandt: Objection.

"The Court: All right; proceed.

"Mr. Shane: I had a good, strong bottom until they used me and put me on a pallet in 1959.

"What happened during that time? Answer me, sir. During that time, do you know what happened?

"This box would say, 'I was loaded on a truck, pulled off other boxes, put on other boxes, put on rollers, put on lines. Some of my friends, the other boxes, were put on the refuse pile. One day, while I was working for Pepsi-Cola, carrying around 50 or 60 pounds, at least five or six years ago, I was taken into a store somewhere. Do you know what happened? I lost one of my nails.'

"Mr. Quandt: Objection.

"Mr. Shane: 'I was all right. I was kept in service. At Christmastime, do you know what happened to me? I was hit; then I lost another nail. Although I lost another nail, I was still used. In 1959, I lost another nail. Sometimes I had to sit out in the rain, sometimes I had to sit out in the snow. Sometimes I would sit in the store, while the Pepsi-Cola was taken out.

" 'In the meantime, while I was sitting there, my bottom was rotting out. Then came February, 1959. I was delivered to a little grocery store on Murray Hill. I was taken off the

truck, holding myself together by one nail, put up on the truck, put on the rack, put up on the stack. A couple of days later a man tried to lift me up and finally the accumulation of all these years took its toll because my bottom had rotted out. One nail could not take any more.'

"Thank you, Mr. Box. You may step down."

It is well settled law that when there is some evidence in the record counsel may make inferences and deductions therefrom in their closing arguments. 53 Ohio Jurisprudence 2d 168, Trial, Section 257. Furthermore, considerable liberality is allowed counsel in drawing such inferences. See 53 Ohio Jurisprudence 2d 169, Trial, Section 258.

However, this latitude is not without limitations, and it is improper for counsel to state facts concerning which no evidence has been offered. *Cincinnati Traction Co.* v. *McKim* (1920), 13 Ohio App. 108, 113. It is the duty of the trial court to control the argument of counsel and to see that it is confined to proper limits, especially as in the instant case where a timely objection was made. 53 Ohio Jurisprudence 2d 190, Trial, Section 274. Failure to do so constitutes prejudicial error. *Herman* v. *Teplitz* (1925), 113 Ohio St. 164. Our review of the bill of exceptions reveals that there was absolutely no evidence upon which to base any inferences regarding the rottenness of the Pepsi Cola case or the manner in which this case became weakened. Consequently, we determine, and therefore hold, that prejudicial error was committed by the trial court in its overruling of defendant's objection to this argument.

The judgment of the Court of Common Pleas is reversed, and the cause remanded for further proceedings according to law.

*Judgment reversed.*

ARTL, C. J., and CORRIGAN, J., concur.